

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| **JOHN W. RIDINGER,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 06 C 5721 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **MICHAEL J. ASTRUE,** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, John Ridinger ("Ridinger"), seeks judicial review of a final decision of

Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying

his application for Supplemental Security Income ("SSI") benefits under the Social Security Act,

42 U.S.C. § 401 *et seq.* Currently before the Court are Ridinger's motion to reverse the final

decision of the Commissioner and the Commissioner's cross-motion for judgment on the

pleadings. The parties have consented to have this Court conduct any and all proceedings in this

case, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and Local

Rule 73.1(c). For the reasons set forth below, the Court grants Ridinger's motion and remands

the case for further proceedings consistent with this opinion.

## I. <u>Background</u>

John Walker Ridinger was born in 1962. (R. at 57.) He is a United States citizen currently residing in Elgin, Illinois. (*Id.* at 33.) He completed the twelfth grade in 1980. (*Id.* at 75.) He has never married and has no minor children. (*Id.* at 57.) Ridinger worked as a line inspector in a metal stamping plant from 1988 through 1990. (*Id.* at 78.) The Vocational Expert ("VE") who testified at Ridinger's hearing before the Administrative Law Judge ("ALJ") described this job as unskilled labor at a medium exertional level. (*Id.* at 519-20.) From 1991-2003, Ridinger worked as a chemical handler at a plating shop. (*Id.* at 78.) This job, according to the VE, is classified as heavy labor, but was medium as Ridinger performed it. (*Id.* at 520.) Ridinger has been unemployed since October 2003, when the plating shop closed. (*Id.* at 88.) He reports that his allegedly disabling impairments developed while he was still working at the plating shop. (*Id.* at 507.) His alleged date of disability is October 31, 2003. (*Id.* at 57.)

Ridinger has a long history of bladder and kidney problems, which started at the age of twelve and required multiple surgeries while Ridinger was a child. (R. at 210-17, 220-227, 231-46, 255, 257-59.) In 1999, Ridinger was treated at a hospital for obstructive uropathy[1] and chronic renal insufficiency. (*Id.* at 268.) At the time he was taking the medications Cipro, Atenolol, and Zocor. (*Id.* at 264.) Since at least June 2003, Ridinger has been self-catheterizing every three to four hours due to his obstructive uropathy. (*Id.* at 69, 343.)

---

[1] "Any disease that blocks the flow of urine." Taber's Cyclopedic Medical Dictionary 2278 (20th ed. 2005).

Dr. Nasir Ahmad has been Ridinger's treating kidney specialist since 2002 and has

observed numerous impairments: anemia (secondary to renal disease) (R. at 136, 137, 339, 347.);

deep vein thrombosis ("DVT") (*Id.* at 129, 135, 136, 175, 191, 339, 344); dyslipidemia[2] (*Id.* at

136, 339); edema[3] of the lower extremities (*Id.* at 135, 147, 161, 343.); fatigue (*Id.* at 161, 208.);

gout (*Id.* at 130, 173, 347, 475.); gynecomastia[4] (*Id.* at 130, 169, 171.); hypertension (HTN)

(*Id.* at 130, 339, 347, 483.); hyperkalemia[5] (*Id.* at 173.); interstitial nephropathy or nephritis[6]

(*Id.* at 136, 137, 339, 495.); obesity (*Id.* at 161.); pain (*Id.* at 130-31, 135); pyelonephritis[7] (*Id.* at

136.); chronic renal failure (*Id.* at 130, 136, 137, 182, 191, 344, 483.); urinary tract infections

(*Id.* at 137.); and vesicoureteral reflux.[8] (*Id.* at 171.) To treat these conditions, Ridinger has taken

or is presently taking the following prescribed medications: Allopurinol (*Id.* at 476.); Atenolol

(*Id.* at 130, 161, 340, 476.); Cipro (*Id.* at 130, 136, 476.); Coumadin (*Id.* at 136, 340.); Florinef

---

[2] "A condition marked by abnormal concentrations of lipids or lipoproteins in the blood." Merriam-Webster's On-line Medical Dictionary, at http://medical.meriam-webster.com/medical/dyslipidemia (last viewed November 21, 2008).

[3] "A local or generalized condition in which the body tissues contain an excessive amount of tissue fluid." Taber's Cyclopedic Medical Dictionary 665 (20th ed. 2005).

[4] "Enlargement of breast tissue in the male." Taber's Cyclopedic Medical Dictionary 918 (20th ed. 2005).

[5] "An excessive mount of potassium in the blood." Taber's Cyclopedic Medical Dictionary 1033 (20th ed. 2005).

[6] "Inflammation of kidneys caused by bacteria or their toxins." Taber's Cyclopedic Medical Dictionary 1440 (20th ed. 2005).

[7] "Inflammation of the kidney and renal pelvis, usually as a result of a bacterial infection that has ascended from the urinary bladder." Taber's Cyclopedic Medical Dictionary 1826 (20th ed. 2005).

[8] "The backward flow of urine up the ureter during urination, instead of downward into the bladder." Taber's Cyclopedic Medical Dictionary 1870 (20th ed. 2005).

(*Id.* at 130, 161, 340.); Furosemide (*Id.* at 476.); Lasix (*Id.* at 161.); Levaquin (*Id.* at 284, 286.); Lovenox injections (*Id.* at 136); Oxycontin (*Id.* at 130); Vicodin (*Id.* at 172); and Zocor (*Id.* at 130, 161, 340).

Despite his severe impairments, Dr. Ahmad's treatment notes state that Ridinger was sometimes "asymptomatic," with no complaints of nausea, vomiting, or shortness of breath. (R. at 191, 201, 482-83.) On other visits, Ridinger complained of worsened swelling in his legs. (*Id.* at 126.) In August 2002 Ridinger had 3+ dependent edema. (*Id.* at 169.) At the same time, he seemed to be "doing quite well" and was asymptomatic, with no complaints of nausea, vomiting, or shortness of breath. (*Id.*) In January 2003, Ridinger was advised to continue all medications, but no dependent edema was observed. (*Id.* at 171.) In April 2003, Ridinger suffered a possible gout attack and was advised to stay off his left foot for four days. (*Id.* at 131-32.) He was hospitalized for eight days in June 2003 due to complications related to his DVT. (*Id.* at 135-37.) In the months preceding the October 2003 closure of the plating shop where Ridinger worked, Ridinger suffered from worsened swelling (*Id.* at 124-127.) and 2-3+ pitting edema. (R. at 124.) As a result, Dr. Ahmad recommended that Ridinger continue taking all prescribed medications and elevate his leg at night. (*Id.* at 123.) In addition, Ridinger began wearing support hose to reduce swelling. (*Id.* at 127.)

Ridinger's edema advanced to 4+ by May 2004, and he began complaining of fatigue, lethargy, and shortness of breath. (R. at 161.) In a May 17, 2004, letter to the Social Security Administration, Dr. Ahmad stated that Ridinger was suffering from near end-stage renal failure, 4+ pitting edema, fatigue, and chronic urinary tract infections. (*Id.* at 147.) Dr. Ahmad opined that Ridinger was unable to maintain gainful employment because of these impairments. (*Id.*)

- 4 -

Dr. Ahmad also stated that he anticipated that Ridinger would start dialysis therapy soon. (*Id.*) In a letter dated April 5, 2005, Dr. Ahmad wrote that Ridinger's kidney function continued to worsen and that he was closer to starting dialysis therapy. (*Id.* at 207.) Ridinger began dialysis in March 2006. (*Id.* at 497-98.)

Ridinger's application for disability asserted that his impairments caused him to work fewer hours and alter his work duties, limited the amount of time he could stand or walk on the job, and required him to receive assistance from co-workers while at work. (R. at 69-89.) According to his application, he also experiences limitations in many of his daily activities. (*Id.* at 86-88.) He has trouble standing up after bending down, difficulty tying his shoes when his leg is swollen, and he becomes fatigued when carrying heavy items. (*Id.* at 86.) Rising from chairs and from his bed causes leg and back pain. (*Id.* at 87.) He suffers intermittent discomfort when getting into his truck. (*Id.*) He can ascend stairs with only minor discomfort, but has great difficulty descending stairs. (*Id.*) When shopping, he sometimes needs to sit and rest. (*Id.*) Similarly, although he can clean the house and do his own laundry, he has to take one or two thirty-minute breaks while doing either of these activities. (*Id.*) His brother mows his yard for him, but Ridinger can rake leaves if he takes several breaks. (*Id.* at 88.) Ridinger is unable to participate in sports, but tries to get exercise by walking. (*Id.*)

At an administrative hearing on March 28, 2006, Dr. Carl Leigh testified as a non-examining medical expert. (R. at 508-515.) Dr. Leigh stated that Ridinger was impaired by chronic renal insufficiency secondary to interstitial nephritis and a DVT, which required that he take anticoagulants and elevate his leg at night. (*Id.* at 509-510.) Ridinger was also taking prescription medications to treat his frequent urinary tract infections, high blood pressure, and

gout. (*Id.* at 511.) Dr. Leigh concluded that in February 2006, Ridinger met Social Security Listing 6.02(a) because he was on dialysis, but that prior to February 2006, Ridinger did not meet a Listing and was limited to a sedentary level of physical exertion with total avoidance of hazardous unprotected heights and hazardous machinery, as well as limits on pushing, pulling, and operating foot controls with his left foot. (*Id.* at 511-12.)

Dr. Leigh testified that prior to February 2006, Ridinger had fluid overload, an impairment described in the Listings, but did not meet one of the requirements for that Listing because he did not have a diastolic blood pressure of 110 millimeters or higher. (R. at 513). Dr. Leigh stated that in October 2003, Ridinger had a creatinine clearance level that met the criteria for the Listings, but that this high level was not persistent. (*Id.* at 510.) The medical records, according to Dr. Leigh, indicated that Ridinger's fluid overload was not a persistent problem because at times no edema was noted on examination and Ridinger's lungs were clear. (*Id.* at 513.) Dr. Leigh added that the medical records often described Ridinger as asymptomatic, meaning that he had no complaints and, more specifically, that he had no shortness of breath, nausea, or vomiting. (*Id.* at 511.)

Dr. Leigh testified that not every person with a DVT is required to elevate his leg during the day. (R. at 513.) Whether Ridinger's leg needed to be elevated depended on how much edema was present and whether the leg could be wrapped. (*Id.* at 513.) Dr. Leigh also stated that when elevation is required, the leg should be elevated horizontally; placing the leg on a footstool is not sufficient. (*Id.* at 514.) Dr. Leigh stated that he would be concerned if a patient told him that he found it necessary to elevate his leg during the day, even if a doctor had not prescribed it. (*Id.* at 513.)

Ridinger also testified before the ALJ regarding his impairments. He said that he generally elevated his left leg for at least two hours during the day while sitting. (R. at 510.) He stated that Dr. Ahmad had recommended that he elevate the leg at night, but had not mentioned elevating it during the day. (*Id.*) Ridinger did not know why Dr. Ahmad had not made a recommendation to elevate his leg during the day. (*Id.*)

The VE testified at the hearing in response to a hypothetical question from the ALJ regarding whether a person of Ridinger's age, education, background, and work history, who was limited to sedentary work with the additional limitations Dr. Leigh recommended, would be able to work in the regional economy. (R. at 520-521.) The VE testified that the restrictions indicated by Dr. Leigh eliminated Ridinger's past relevant work, but that he could perform a number of jobs in the regional economy, including sedentary cashier (26,000 jobs regionally), information clerk (4,700 jobs regionally), general office clerk (23,000 jobs regionally), and inventory clerk (1,200 jobs regionally). (*Id.* at 520-21.) The VE added that if it was necessary for Ridinger to elevate his leg for even two hours a day, all work would be precluded. (*Id.* at 521.)

On April 21, 2006, the ALJ issued a decision granting Ridinger's claim for disability for the period after February 1, 2006. (R. at 14-20.) The ALJ found that Ridinger was not disabled prior to February 1, 2006. (R. at 19.) Ridinger filed a timely request for review that was denied by the SSA's Appeals Council, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 4-6.) It is to that decision that the Court now turns.

## II. The ALJ's Decision

The ALJ made the following findings and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 C.F.R. 404.1520(b) and 404.1571 *et seq.*).

3. Since the alleged onset date of disability, the claimant has had the severe impairments of DVT of the left lower extremity and chronic renal insufficiency (20 C.F.R. 404.1520(c)).

4. Prior to February 1, 2006, the claimant did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 1520(d)).

5. Prior to February 1, 2006, the claimant had the residual functional capacity to perform a somewhat restricted range of sedentary work. He needed to avoid hazards such as unprotected heights, and he needed to avoid even moderate exposure to dangerous moving machinery. He could only occasionally push and/or pull with his lower extremities.

6. Prior to February 1, 2006, the claimant was unable to perform his past relevant work (20 C.F.R. 404.1565).

7. The claimant was born on March 6, 1962 and was 41 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 C.F.R. 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564).

9. Transferability of job skills is not material to the determination of disability due to the claimant's age (20 C.F.R. 404.1568).

10. Prior to February 1, 2006, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national

economy that the claimant could have performed (20 C.F.R. 404.1560(c) and 404.1566).

11. Beginning on February 1, 2006, the severity of the claimant's renal disease met the requirements of section 6.02(A) of Appendix 1.

12. The Claimant was not disabled prior to February 1, 2006 (20 C.F.R. 404.1520(g)), but became disabled on that date and has continued to be disabled through the date of this decision (20 C.F.R. § 404.1520(d)).

(R. at 16-19.)

## III. Discussion

### A. Standard of Review

This Court will uphold the ALJ's decision "if it is supported by substantial evidence and is free of legal error." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002) (citing 42 U.S.C. §405(g)). Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In reviewing the ALJ's decision under the substantial evidence standard, this Court will not reweigh the evidence or substitute its judgment for the judgment of the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000). However, the Court will not act as a "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). Rather, this court must ensure that the ALJ has articulated his analysis of the case at some minimal level. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ's decision must build "an accurate and logical bridge from the evidence to [his] conclusion." *Steele,* 290 F.3d at 941 (internal quotation and citation omitted). It also requires that the ALJ "confront evidence that does not

support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). If the ALJ's decision does not meet these minimum requirements because the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," this Court will reverse and remand the decision. *Steele*, 290 F.3d at 940.

## B.    The Five-Step Inquiry for Benefits Determination

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual is considered to be disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant is considered to be "unable to engage in substantial gainful activity" when he is unable to perform his previous work or engage in any other kind of substantial work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). In order to determine whether a claimant is disabled under the statue, the ALJ employs a five-step inquiry:

> In the first step the ALJ considers the applicant's present work activity. Second, the ALJ weighs the severity of the applicant's impairment. The impairment or combination of impairments must severely restrict an applicant's physical or mental ability to perform basic work activities or an ALJ should enter a finding of not disabled. Third, the ALJ decides whether the impairment or combination of impairments meets or equals an impairment listed within the regulations which are conclusively disabling. If an ALJ is unable to make a disability determination in the first three steps, then the process proceeds to an assessment of the applicant's residual functional capacity (RFC). At the fourth step, the ALJ determines whether the RFC prevents the applicant from performing his or her past relevant work. If not, in the fifth and final step the ALJ uses the assessment of RFC

> to determine if the applicant can make an adjustment to other work based on the applicant's age, education, and work experience.

*Arnold v. Barnhart,* 473 F.3d 816, 820-21 (7th Cir. 2007) (internal citations omitted). The claimant has the burden of proof as to the first four steps, while at step five the burden shifts to the Commissioner to show that the claimant's residual functional capacity allows him to do some work within the national economy. *Clifford,* 227 F.3d at 868.

In this case, the ALJ found that Ridinger had not engaged in substantial gainful activity since the alleged onset of his disability and that he was severely impaired by a deep vein thrombosis (DVT) of the left lower extremity and chronic renal insufficiency. (R. at 16.) However, the ALJ found that Ridinger's impairments did not meet or medically equal a listed impairment until February 1, 2006, and that prior to that date Ridinger retained the necessary RFC to perform several jobs in the regional economy. (*Id.* at 16-19.) Ridinger alleges that there are several bases upon which to reverse the ALJ's finding that Ridinger was not disabled prior to February 1, 2006. First, Ridinger argues that the ALJ's Step Two determination was erroneous because the ALJ failed to consider all of the evidence and failed to consider the combined effects of Ridinger's impairments. Second, Ridinger argues that the ALJ's Step Three determination was erroneous because the ALJ provided no analysis to support his decision and failed to consider the combined effects of Ridinger's impairments. Third, Ridinger argues that the ALJ's RFC determination was unsubstantiated because the ALJ did not provide sufficient analysis to support his conclusions. Fourth, Ridinger argues that the ALJ failed to articulate the grounds for his determination that Ridinger's testimony was not credible. Finally, Ridinger argues that the ALJ's Step Five determination was erroneous because the ALJ failed to re-contact Ridinger's treating

physician in order to clarify whether Ridinger was medically required to elevate his leg during the day. The Court addresses these arguments in turn.

## C.    The ALJ's Step Two Analysis

At Step Two, the ALJ is required to assess the claimant's impairments to determine whether "any impairment or combination of impairments . . . significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 404 1520(c); SSR 96-3p. The ALJ must consider "the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. The ALJ is not required to address every piece of testimony and evidence in his decision. *Stephens v. Heckler,* 766 F.2d 284, 287 (1985). However, the ALJ may not ignore entire lines of evidence or select and discuss only the evidence that supports his conclusion. *Diaz v. Chater,* 55 F.3d 300, 307 (7th Cir. 1995). The ALJ is required to "sufficiently articulate his assessment of the evidence to assure [the Court] that the ALJ considered the important evidence ... [and to enable the Court] to trace the path of the ALJ's reasoning." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (internal quotation and citation omitted).

At Step Two of his analysis, the ALJ found that Ridinger was severely impaired by "a DVT of the left lower extremity and chronic renal insufficiency." (R. at 16.) Ridinger argues that this determination was incomplete and erroneous as to the period prior to February 1, 2006, because the ALJ failed to consider all of the evidence and failed to consider Ridinger's impairments in combination.

- 12 -

In addition to a DVT of the left lower extremity and chronic renal insufficiency, the ALJ acknowledged that Ridinger suffered from interstitial nephritis and frequent urinary tract infections. (R. at 17.) He also noted that Ridinger had some fluid overload and "minimal" edema in July 2005, and that he was placed on Coumadin to treat his deep vein thrombosis. (*Id.* at 17.) The ALJ did not indicate that he considered any of the following impairments that appear in the factual record, as discussed in Section I above: anemia; dyslipidemia; fatigue; gout; gynecomastia; HTN; hyperkalemia; obesity; pain; pyelonephritis; and vesicoureteral reflux. Nor did the ALJ indicate whether he had considered Ridinger's use of the following prescribed medications: Allopurinol; Atenolol; Cipro; Florinef; Furosemide; Lasix; Levaquin; Lovenox injections; Oxycontin; Vicodin; and Zocor. The ALJ's Step Two analysis did not mention any of the evidence regarding these ailments and medications or provide an assessment of their combined effects.

Even impairments that are not severe on their own must be considered because the combination of impairments may be severe. 20 C.F.R. § 404.1523. Although anemia, dyslipidemia, fatigue, gout, gynecomastia, HTN, hyperkalemia, obesity, pain, pyelonephritis, and vesicoureteral reflux may not be considered severe impairments on their own, the combination of these impairments could be considered severe. Nowhere did the ALJ explicitly consider the combined effect of all of Ridinger's impairments. The only point at which the ALJ arguably approached the subject is his statement that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR § 404.1529 and SSRs 96-4p and 96-7p." (R. at 17.) Such "boilerplate" assertions do not suffice to demonstrate that the ALJ truly

considered all of the evidence of record or considered the combined effect of Ridinger's impairments. *See, e.g., Hardman v. Barnhart,* 362 F.3d 676, 679 (10th Cir. 2004).

The Commissioner argues that under *Nelson v. Bowen,* 855 F.2d 503 (7th Cir. 1988), the ALJ's statement that he "considered all symptoms" is sufficient. The Court disagrees. In *Nelson,* the Seventh Circuit considered an ALJ's statement that "[t]he evidence does not show any medically determinable impairments which, singly or combined, preclude claimant from engaging in substantial gainful activity." 855 F.2d at 508. Relying on this language, the court stated that the ALJ "apparently *did* consider the combined effects" of the claimant's impairments. *Id.* (emphasis added). However, the Court does not believe that *Nelson* controls the outcome of this case. First, it must be noted that the language the Commissioner cites was dicta and was not necessary to the Seventh Circuit's resolution of the appeal, since the appellant's case was already being remanded on other grounds. Second, the Seventh Circuit in *Nelson* went on to state that "the ALJ could perhaps have done a better job of developing the record in this regard," and suggested that "on remand further consideration should be given to the combined effects of [the claimant's] impairments." *Id.* This is hardly an endorsement of the approach the ALJ took in that case. Third, the language in *Nelson* is distinguishable from the language used by the ALJ in this case because the ALJ in *Nelson* at least mentioned that he considered the claimant's impairments "singly" and "combined." In this case, the ALJ's only references to the combined effects of Ridinger's numerous impairments are his finding that "the claimant did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1" (R. at 16) and his statement that he "considered all

symptoms." (R. at 17.) Both of these are "boilerplate" references, insufficient for the purposes of 20 C.F.R. § 404.1523. *See Hardman*, 362 F.3d at 679.

There is no indication that the ALJ fulfilled his duty to consider all of the relevant evidence because he did not articulate any analysis of the combined effects of all of Ridinger's impairments. *See Diaz*, 55 F.3d at 307 (recognizing that failure to articulate reasoning is a basis for remand). The Commissioner argues that any error was harmless. However, the Court disagrees. Because the scope and severity of the impairments evaluated at Step Two can impact the ALJ's equivalence determination at Step Three and his Residual Functional Capacity determination at Step Four, remand is warranted where the ALJ fails to consider the entirety of the evidence at Step Two. *See Unger v. Barnhart*, 507 F. Supp. 2d 929, 939 n.3 (N.D. Ill. 2007).

### D. The ALJ's Step Three Analysis

At Step Three, "the ALJ decides whether the [claimant's] impairment or combination of impairments meets or equals an impairment listed within the regulations which are conclusively disabling." *Arnold*, 473 F.3d at 821. If the claimant's impairment or combination of impairments meets or equals one of the conclusively disabling impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1, the ALJ will find the claimant disabled. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant has the burden of providing evidence sufficient to demonstrate that his impairment or combination of impairments meets or equal one of the listed disabilities. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). However, remand is warranted when an ALJ fails to mention the specific listings under consideration and provides only "perfunctory analysis" to support his finding. *Id.*

At Step Three of his analysis, the ALJ determined that "[p]rior to February 1, 2006, [Ridinger] did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404 Subpart P, Appendix 1 (20 CFR 404.1520(d))." (R. at 16.) The ALJ also found that "[b]eginning on February 1, 2006, the severity of the claimant's renal disease met the requirements of section 6.02(A) of Appendix 1." (*Id.* at 19.) Ridinger argues that the ALJ's Step Three determination must be reversed and remanded as to the period prior to February 1, 2006, because the ALJ provided no analysis to support his conclusion and failed to take into consideration the combined effects of Ridinger's impairments.

The Commissioner argues that the ALJ provided sufficient analysis by citing and relying on the opinion of Dr. Leigh, the medical expert who testified at the administrative hearing. The Court disagrees. Ridinger's treating physician, Dr. Ahmad, opined as early as May 17, 2004, that Ridinger's "history of bilateral hydroureter with mega ureters and interstitial nephropathy which over the years have progressed into near end stage renal failure," along with his edema and chronic urinary tract infections, rendered him unable to maintain gainful employment. (R. at 147.) When an ALJ does not give controlling weight to a treating physician's opinion, the ALJ must "provide good reasons for the weight given to that opinion and specifically consider length of treatment relationship, frequency of treatment, nature and extent of treatment relationship, supportability, consistency, and specialization." *David v. Barnhart,* 446 F. Supp. 2d 860, 871 (N.D. Ill. 2006); *see also* 20 C.F.R. § 404.1527(d). The ALJ's decision cannot leave the weight given to the treating physician's testimony to mere inference: "the decision must be sufficiently

specific to make clear to any subsequent reviewers the weight the ALJ gave to the treating source's medical opinion and the reasons for that weight." *David,* 446 F. Supp. 2d at 871.

In this case, the ALJ failed to address Dr. Ahmad's opinion that Ridinger's impairments had progressively worsened, making him unable to obtain gainful employment much earlier than February 2006. (R. at 147.) The ALJ's opinion did explain the weight he accorded to the consulting expert's opinions, stating that "[the ALJ] must give very substantial weight to the opinions of [Dr. Leigh], since he is familiar with the disability program and has had the opportunity to review and evaluate the entire record, including both the written documentation and hearing testimony." (R. at 17.) But this does not explain why the ALJ rejected the treating physician's opinion. Like the ALJ in *Ribaudo*, the ALJ in this case failed to consider evidence favorable to Ridinger and relied entirely on the opinion of the consulting medical expert without providing any analysis explaining this decision or the weight given to the treating physician's contrary opinion. 458 F.3d at 584. As in *Ribaudo,* reversal is warranted because the ALJ's acceptance of the medical expert's opinion does not sufficiently explain his rejection of Dr. Ahmad's opinion. *Id.*

The Commissioner argues that any error was harmless because the ALJ's acceptance of Dr. Leigh's opinion and reiteration of Dr. Leigh's testimony implicitly convey the ALJ's reasons for rejecting Dr. Ahmad's opinion. The Court finds this argument unpersuasive. The Commissioner relies on *Nelson v. Commissioner of Social Security,* an unpublished Sixth Circuit decision holding that an ALJ's failure to discuss the opinions of two treating physicians was harmless where the ALJ's discussion of the evidence and the opinions of several other medical experts indirectly attacked the credibility of the two treating physicians' opinions. 195 Fed.

- 17 -

Appx. 462, 470 (6th Cir. 2006). The Sixth Circuit admitted that *Nelson* was a "rare case" and stressed the importance of the "procedural protection" provided by 20 C.F.R. § 404.1527(d)'s guidelines for evaluating expert opinions. *Id.* at 472. This Court knows of no Seventh Circuit case that has followed *Nelson*'s rationale. Instead, the Seventh Circuit has consistently held that an ALJ must articulate his reasons for rejecting a treating physician's opinion. *See, e.g., Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). Furthermore, even if *Nelson* were controlling, the present case is distinguishable because the ALJ here provided only a cursory discussion of the evidence and the medical expert's opinion.

Because the ALJ relied on the consulting physician's opinion that Ridinger was not disabled prior to February 2006 without articulating the reasons for his decision not to accord controlling weight to the opinion of Ridinger's treating physician, his finding at Step Three must be reversed and the case remanded for further proceedings.

### E.    The ALJ's Residual Functional Capacity Determination

Ridinger argues that the ALJ's Residual Functional Capacity (RFC) determination was flawed because it was not supported by any analysis and was not based on a function-by-function assessment of Ridinger's abilities as required by SSR 96-8p. The ALJ is responsible for determining a claimant's RFC based on all functional limitations resulting from the claimant's medically determinable impairments or combination of impairments. 20 C.F.R. § 404.1546(c); SSR 96-8p. In determining a claimant's RFC, the ALJ must conduct a function-by-function analysis of the limitations on the claimant's work-related abilities and provide a narrative

discussion of each conclusion. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352-53 (7th Cir. 2005); SSR 96-8p. Reversal and remand are warranted when the ALJ fails to explain his conclusions. *Briscoe*, 425 F.3d at 352. In this case, the Court finds that the ALJ's RFC determination must be reversed.

In considering Ridinger's RFC, the ALJ found that "[p]rior to February 1, 2006, the claimant had the residual functional capacity to perform a somewhat restricted range of sedentary work. He needed to avoid hazards such as unprotected heights, and he needed to avoid even moderate exposure to dangerous moving machinery. He could only occasionally push and/or pull with his lower extremities." (R. at 16.) Although he found that Ridinger was limited in his ability to push and pull with his legs and could not be exposed to heights or dangerous machinery, the ALJ did not articulate his findings regarding other significant functional categories such as lifting, walking, standing, and sitting. These functional areas would seem to be crucial in this case, where Ridinger's claims are based in part on alleged leg impairments. The ALJ also failed to articulate the "logical bridge" connecting the facts of the case to his RFC finding. The ALJ noted that Ridinger had sometimes been "asymptomatic" when examined by Dr. Ahmad. (R. at 17.) This may be relevant, but it falls short of fully explaining his finding that Ridinger did have certain limitations but remained able to perform sedentary work. The same is true for the ALJ's finding that Ridinger stopped working because of a layoff rather than physical impairments.

It appears, based on the transcript, that the ALJ's RFC finding was based on the more specific analysis provided by Dr. Leigh at the hearing, where he discussed Ridinger's abilities in various functional areas. The ALJ's opinion states that the ALJ "must give very substantial

weight" to Dr. Leigh's opinion, but does not articulate the specifics of that opinion or indicate the specific parts of the opinion that the ALJ adopted. The ALJ cannot evade his obligation to provide a function-by-function evaluation of Ridinger's RFC merely by referencing the medical expert's more expansive testimony. Because the ALJ failed to provide a function-by-function evaluation of Ridinger's RFC and explain the factual basis for his findings, his RFC determination must be reversed. *Briscoe*, 425 F.3d at 352.

### F.    The ALJ's Credibility Determination

Ridinger argues that the ALJ's decision must be reversed because the ALJ failed to provide an adequate rationale for his conclusion that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not indicative of disabling impairments that preclude all work at all exertional levels prior to the established onset date." (R. at 17.) An ALJ's credibility determination is a finding of fact, and, as such, is entitled to special deference from a reviewing court. *Scheck v. Barnhart,* 357 F.3d 697, 703 (7th Cir. 2004). Because the ALJ is in the best position to observe witnesses and determine their truthfulness, the Court will only overturn the ALJ's credibility determination if it is patently wrong. *Skarbek,* 390 F.3d at 504. While the Court gives deference to the ALJ's decision regarding credibility, SSR 96-7p requires the ALJ to specify the reasons for his credibility determination "so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony." *Golembiewski v. Barnhart,* 322 F.3d 912, 916 (7th Cir. 2003).

The Court finds that the ALJ's credibility determination cannot stand because it is unclear from the ALJ's opinion exactly what weight the ALJ accorded to Ridinger's testimony, what aspects he accepted or rejected, and why. The ALJ's finding on credibility, which is quoted in its entirety in the paragraph above, is situated in the midst of the ALJ's Step Four analysis and is preceded and followed by paragraphs that discuss the medical evidence in the record. The opinion does not identify any particular aspect of Ridinger's testimony that the ALJ considered. Nor does it indicate whether the ALJ found that Ridinger's testimony was not credible, or whether he found it credible but concluded that it did not establish that his impairments were so serious as to be disabling. Perhaps its location in the midst of paragraphs discussing the medical evidence is meant to imply that the medical evidence contradicts Ridinger's testimony. Whatever the case may be, the ALJ's articulation of his credibility determination fails to convey what weight he gave to Ridinger's testimony and the reasons it was granted that weight. Therefore, in accordance with SSR 96-7p, the ALJ's credibility determination must be reversed. *Golembiewski*, 332 F.3d at 916.

## G.    The ALJ's Step Five Determination

Ridinger argues that the ALJ's Step Five determination must be reversed because the ALJ did not re-contact Dr. Ahmad to clarify whether it was mandatory for Ridinger to elevate his leg during the day. When an ambiguity in the evidence must be resolved in order for the ALJ to determine whether the claimant is disabled, the ALJ has a duty to re-contact the medical source for clarification. *See Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (collecting cases). The ALJ, at his discretion, may refrain from re-contacting a medical expert when sufficient

evidence exists for him to make a disability determination. *Skarbek,* 390 F.3d at 504. In this case, Ridinger agrees that Dr. Ahmed did not tell him he needed to elevate his leg during the day, and Dr. Leigh testified that not every patient with a DVT needs to elevate the affected leg all of the time. (R. at 513.) In light of this evidence suggesting that it was not necessary to elevate the leg, the Court finds that the ALJ acted within his discretion in deciding not to re-contact Dr. Ahmad about a possible ambiguity in his recommendations. On remand, the ALJ may elect to re-contact Dr. Ahmad on this issue, but he is not required to do so.

Ridinger also argues that the ALJ committed reversible error by failing to discuss the VE's testimony that Ridinger would be unable to perform any sedentary job if he was required to elevate his leg during the day. The Court finds that in light of Ridinger's testimony, the testimony of Dr. Leigh, and Dr. Ahmad's failure to recommend that Ridinger elevate his leg during the day, substantial evidence supported the ALJ's finding that Ridinger did not need to elevate his leg during the day. The ALJ is not required to discuss hypothetical questions based on restrictions that the claimant does not have. Therefore, the ALJ's Step Five finding does not provide an independent basis to remand the case, though on remand it must be amended to take into account any changes at Steps Two through Four.

## IV. Conclusion

For the reasons stated above, Ridinger's motion to reverse the final decision of the Commissioner is granted, the Commissioner's cross-motion for judgment on the pleadings is

denied, and the ALJ's decision denying Ridinger's claim for SSI benefits for the period prior to February 1, 2006, is reversed and remanded for further proceedings consistent with this opinion.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: November 24, 2008.